**FAEGRE DRINKER BIDDLE & REATH LLP**
David J.F. Gross (SBN 290951)
david.gross@faegredrinker.com
1950 University Avenue, Suite 450
East Palo Alto, California 94303
Telephone: +1 650 324 6700
Facsimile: +1 650 324 6701

**MOORE RUDDELL LLP**
Howard D. Ruddell (SBN 281510)
*hruddell@mooreruddell.com*
21250 Hawthorne Blvd., Suite 500
Torrance, California 90503
Telephone: +1 310 792 7010
Facsimile: +1 323 530 1113

*[additional counsel listed on signature page]*

*Attorneys for Defendant/Counterclaimant*
Samsung Electronics Co., Ltd., and *Defendant*
Samsung Electronics America, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S10 ENTERTAINMENT & MEDIA LLC, <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD.; SAMSUNG ELECTRONICS AMERICA, INC., <br><br> Defendants. | Case No. 2:21-CV-2443-CAS-JPR <br><br> District Judge: Hon. Christina A. Snyder <br><br> **DEFENDANTS' CORRECTED MOTION TO EXCLUDE EVIDENCE AND TESTIMONY FROM MARK KEEGAN; MEMORANDUM OF LAW IN SUPPORT THEREOF** |
| SAMSUNG ELECTRONICS CO., LTD., <br><br> Counterclaimant/Defendant, <br><br> v. <br><br> S10 ENTERTAINMENT & MEDIA LLC, <br><br> Counterclaim Defendant/Plaintiff. | Date: January 23, 2023 <br> Time: 10:00 a.m. <br> Ctrm: 8D <br><br> Counterclaim: August 23, 2021 <br> FAC Filed: July 20, 2021 <br> Complaint Filed: March 19, 2021 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on Monday, January 23, 2023, at 10:00 a.m., in the courtroom of the Honorable Christina A. Snyder of the United States District Court for the Central District of California, First Street Courthouse, Courtroom 8D, 350 W. First Street, 8th Floor, Los Angeles, CA 90012, or as soon thereafter as this matter may be heard, Defendants Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. will and hereby do move this Court for an order precluding Plaintiff's expert witness, Mr. Mark Keegan, from testifying at trial or presenting evidence based on a survey purporting to show a likelihood of confusion. Mr. Keegan's report and intended testimony do not meet the threshold of reliability required under *Daubert* and Federal Rule of Evidence 702. Further, Mr. Keegan's report and intended testimony should be excluded under Federal Rule of Evidence 403, as they would confuse, rather than help, the trier of fact, and result in prejudice to Defendants.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Louis T. Perry ("Perry Decl.") and the Exhibits therewith, all papers on file with the Court, and such other matters as may be presented at the time of the hearing.

Pursuant to Local Rule 7-3, on December 15, 2022, counsel for Defendants conferred with counsel for Plaintiff regarding the substance of the subject motion. Counsel were unable to reach a resolution.

1
2

**FAEGRE DRINKER BIDDLE & REATH LLP**

3   Dated: December 23, 2022

By: */s/ Christopher J. Burrell*

4

David J.F. Gross

5

6

James R. Steffen (*pro hac vice*)
*james.steffen@faegredrinker.com*
Lauren W. Linderman (SBN 280809)

7

*lauren.linderman@faegredrinker.com*
2200 Wells Fargo Center

8

90 S. Seventh Street
Minneapolis, Minnesota 55402

9

Telephone:    +1 612 766 7000

10

Christopher J. Burrell (*pro hac vice*)
*christopher.burrell@faegredrinker.com*

11

Katlyn M. Moseley (*pro hac vice*)
*katlyn.moseley@faegredrinker.com*

12

1500 K Street NW, Suite 1100
Washington, D.C. 20005

13

Telephone:    +1 202 842 8800

14

Louis T. Perry (*pro hac vice*)
*louis.perry@faegredrinker.com*

15

300 N. Meridian Street, Suite 2500
Indianapolis, Indiana 46204

16

Telephone:    +1 317 237 0300

17

*Attorneys for Defendant/Counterclaimant*
Samsung Electronics Co., Ltd., and

18

*Defendant* Samsung Electronics America, Inc.

19

20

21

22

23

24

25

26

27

28

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN          - 2 -          CASE NO. 2:21-CV-02443-CAS-JPRX

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................. 1

II.    BACKGROUND .................................................................................... 2

III.   LEGAL STANDARD ........................................................................... 9

IV.    KEEGAN'S SURVEY IS UNRELIABLE, DID NOT CONFORM TO THE *EVEREADY* FORMAT, DID NOT TEST FOR REVERSE CONFUSION, AND SHOULD BE EXCLUDED ....................................... 11

       A.     Keegan Surveyed an Overly Broad and Largely Irrelevant Universe ................................................................................... 12

       B.     Contrary to Accepted *Eveready* Survey Design, The Keegan Survey Used Leading Qualification Questions To Introduce Samsung and Bias the Results ............................................... 15

       C.     Contrary to Accepted *Eveready* Survey Design, the Keegan Survey Does Not Use Stimuli That Replicate Marketplace Conditions ........................................................................... 16

       D.     Keegan's Survey of "Use" of the S10 Name Does Not Measure Confusion and Is Not an Accepted Variant of the *Eveready* Format ................................................................................... 19

V.     CONCLUSION .................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Allstate Ins. Co. v. Kia Motors Am., Inc.*,
No. 16-cv-06108-SJO (AGRx), 2017 WL 10311211, at (C.D. Cal.
Sept. 20, 2017) ................................................................................................ 11

*Beyond Blond Prods., LLC v. Heldman*,
No. CV205581DSFGJSX, 2021 WL 4860376 (C.D. Cal. Aug. 13,
2021), *aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX,
LLC,* No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022) .................... 10

*Brighton Collectibles, Inc. v. RX Tex. Leather Mfg.*,
923 F. Supp. 2d 1245 (S.D. Cal. 2013) ..................................................... 10, 16

*Combe Inc. v. Dr. Aug. Wolff GmBH & Co. KG Arzneimittel*,
382 F. Supp. 3d 429 (E.D. Va. 2019), *aff'd*, 851 F. App'x 357 (4th
Cir. 2021) ........................................................................................................ 19

*CSL Silicones, Inc. v. Midsun Grp. Inc.*,
No. 3:14-CV-1897 (CSH), 2017 WL 6055380 (D. Conn. Dec. 7,
2017) .......................................................................................................... 11, 15

*Daubert v. Merrell Dow. Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ..................................................................................... 9, 10

*Flushing Bank v. Green Dot Corp.*,
138 F. Supp. 3d 561 (S.D.N.Y. 2015) ............................................................. 10

*Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*,
426 F.3d 1001 (8th Cir. 2005) ........................................................................ 21

*Gucci Am., Inc. v. Guess
?, Inc.*, 831 F. Supp. 2d 723 (S.D.N.Y. 2011), *on reconsideration in
part,* No. 09 CIV. 4373 SAS, 2011 WL 6326032 (S.D.N.Y. Dec. 16,
2011) .......................................................................................................... 11, 17

*Jacobs v. Fareportal, Inc.*,
No. 8:17CV362, 2020 WL 6587245 (D. Neb. May 29, 2020) ........................ 22

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
No. 06 Civ. 550 (JFK), 2007 BL 78876 (S.D.N.Y. Aug. 6, 2007) ............. 12, 15

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN
    - ii -    
CASE NO. 2:21-CV-02443-CAS-JPRX

*Kudos Inc. v. Kudoboard LLC*,
  No. 20-CV-01876-SI, 2021 WL 5415258 (N.D. Cal. Nov. 20, 2021)...10, 14, 16

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ................................................................................9

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
  No. C 12-03762 SI, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ...11, 14, 17, 19

*M2 Software, Inc. v. Madacy Ent.*,
  421 F.3d 1073 (9th Cir. 2005) ..............................................................21

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................................................22

*Medisim Ltd. v. BestMed LLC*,
  861 F.Supp.2d 158 (S.D.N.Y. 2012) ....................................................17

*Rearden LLC v. Rearden Commerce, Inc.*,
  683 F.3d 1190 (9th Cir. 2012) ..............................................................14

*Reinsdorf v. Sketchers U.S.A.*
  922 F. Supp. 2d 866 (C.D. Cal. 2013) ............................................10, 14

*Simon Prop. Grp. LP v. MySimon, Inc.*,
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) .........................................15, 22

*Spangler Candy Co. v. Tootsie Roll Indus., LLC*,
  372 F. Supp. 3d 588 (N.D. Ohio 2019) .................................................10

*Starter Corp. v. Converse, Inc.*,
  170 F.3d 286 (2d Cir.1999) ..................................................................22

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
  868 F. Supp. 2d 415 (E.D. Pa. 2012) ...................................................17

*Sterling Drug, Inc. v. Bayer AG*,
  14 F.3d 733 ..........................................................................................11

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) ..................................................17

*Union Carbide Corp. v. Ever-Ready Inc.*,
  531 F.2d 366 (7th Cir. 1976) ..........................................................11, 12

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN
- iii -
CASE NO. 2:21-CV-02443-CAS-JPRX

*Univ. Of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co., Inc.*,
   703 F.2d 1372 (Fed. Cir. 1983) .......................................................................... 21

*Universal City Studios, Inc. v. Nintendo Co.*,
   746 F.2d 112 (2d Cir. 1984) ............................................................................... 16

*Valador, Inc. v. HTC Corp.*,
   242 F. Supp. 3d 448 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th
   Cir. 2017) ........................................................................................................... 12

*vonRosenberg v. Lawrence*,
   413 F. Supp. 3d 437 (D.S.C. 2019) ............................................................. 10, 14

*Yellowfin Yachts, Inc. v. Barker Boatworks*,
   LLC, 898 F.3d 1279 (11th Cir. 2018) ................................................................ 21

**Statutes, Rules & Regulations**

Fed. R. Evid. 403 ................................................................................................. 10, 22

Fed. R. Evid. 702 ............................................................................................ 9, 10, 22

**Other Authorities**

4 J. Thomas McCarthy, Trademarks & Unfair Competition § 32:172
   (5th ed.) ............................................................................................................. 15

6 J. Thomas McCarthy, Trademarks & Unfair Competition § 32:173.50
   (4th ed.) ................................................................................................... 11, 12, 21

Eric D. DeRosia, *Fixing Ever-Ready: Repairing and Standardizing the
   Traditional Survey Measure of Consumer Confusion*, 53 GA. L. REV.
   613 (2019) ..................................................................................................... 4, 21

Jerre B. Swann, Likelihood of Confusion Studies and the Straitened
   Scope of Squirt, 98 TRADEMARK REP. 739, 741 (2008) ...................................... 4

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN
- iv -
CASE NO. 2:21-CV-02443-CAS-JPRX

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America,

3   Inc. (collectively, "Samsung") submit this memorandum of law in support of their

4   motion to exclude evidence and testimony from plaintiff S10 Entertainment & Media

5   LLC's ("S10 Entertainment") proffered survey expert, Mr. Mark Keegan ("Keegan").

6   **I.    Introduction**

7      This is a trademark case in which the Plaintiff S10 Entertainment is asserting

8   "reverse confusion." As Keegan explains in his report, this requires answering the

9   question of whether likely purchasers of S10 Entertainment's "music management

10  services" encountering S10 Entertainment's trademark would mistake S10

11  Entertainment's services as coming from Samsung, mistakenly believe that Samsung

12  has authorized S10 Entertainment to sell S10 Entertainment's services, or falsely

13  believe that there is an association between Samsung and S10 Entertainment.

14      S10 Entertainment is primarily a talent management company. Thus, the core

15  universe of likely purchasers to survey for reverse confusion would be prospective

16  artists for S10 Entertainment's talent management services. But in this case, ▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Lacking

19  information on S10 Entertainment's core prospective customers, Keegan surveyed

20  people who *either* listened to popular music *or* have a job generally relating to the

21  music or entertainment fields. But Keegan's attempt to side-step ▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with a vastly overbroad universe does not

23  work.

24      As explained below, courts have regularly excluded and criticized Keegan's

25  outcome-driven surveys, and this one is no different. Keegan's survey (i) was not

26  focused on likely purchasers of S10 Entertainment's services, (ii) needlessly

27  introduced the desired survey response, "Samsung," as part of the qualifying questions

28  to the survey, (iii) did not use S10 Entertainment's "S10" mark as it would appear to

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN                - 1 -                CASE NO. 2:21-CV-02443-CAS-JPRX

potential purchasers in the marketplace, and (iv) did not ask a survey question that measures confusion or false associations. Rather, Keegan asked a vague question about companies that use a plain text "S10" name.

His key survey question, thus, did nothing more than survey consumer recognition of companies using an "S10" name. Not surprisingly, given the about ▮ consumer recognition for Galaxy S10 smartphones in the United States based on Samsung's own recent survey data, Keegan found that 26.7% of respondents identified Samsung as a company who uses an "S10" name. Because Keegan's survey does not measure confusion at all, is disconnected from marketplace realities, and produced biased results by introducing "Samsung" into the qualifying questions, Keegan's opinions and testimony should, respectfully, be excluded.

## II.  Background

S10 Entertainment's primary business is providing talent management services to two high profile recording artists, Normani and Anitta. Perry Decl. Ex. B at 394:21-395:3 ▮

▮ *id.* Ex. A ¶ 4 (Keegan Report explaining that S10 Entertainment provides "music management services"). By contrast, Samsung is an electronics company that has since 2010 sold, amongst other consumer electronic products, Samsung's Galaxy S-series of smartphones. *Id.* Ex. C at 57:12-15, 61:7-16)

This case is a trademark dispute in which S10 Entertainment alleges that Samsung's 10th-generation offering in the Galaxy S-series—the Samsung Galaxy S10 smartphone—infringes S10 Entertainment's "S10" mark. S10 Entertainment alleges "reverse" trademark confusion, meaning that it alleges purchasers or potential purchasers of S10 Entertainment's specialized services encountering S10 Entertainment's mark in the marketplace would *mistakenly* believe that it is Samsung providing or sponsoring S10 Entertainment's services. *Id.* Ex. A ¶ 29.

Keegan states that he conducted a "study to measure reverse confusion using the Eveready format." *Id.* Ex. A ¶ 5. The required focus for reverse confusion is the

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN

- 2 -

CASE NO. 2:21-CV-02443-CAS-JPRX

understandings amongst *S10 Entertainment's* customers and potential customers as to the source, affiliation, or sponsorship of *S10 Entertainment's offerings* in the marketplace. Yet, in describing his survey design, Keegan admits that he introduced Samsung into it. Specifically, Keegan states that he was "asked to conduct a study to determine the extent to which, if at all, there is a likelihood of confusion *among consumers between Samsung's S10 smartphones* and S10 Entertainment's music management services." Ex. A ¶ 4 (emphasis added). This undue focus on Samsung from the inception of his survey was improper and lead to biased results as further discussed below.

With respect to his survey design, Keegan qualified respondents for his survey if they either (A) worked in "entertainment or entertainment management" <u>or</u> had "[w]ithin the last year, listened to music within the genres that are managed/produced by S10 Entertainment, namely, modern pop, modern R&B, modern rap, and/or Latin" <u>and</u> (B) "shopped for a cell phone within the last three years." *Id.* Ex. A ¶¶ 23-24. This means a smartphone owner who simply heard Maria Carey's All I Want for Christmas Is You sometime in the last year fit within Keegan's survey design.

From the beginning of his survey, Keegan exposed respondents to the idea that the survey might relate to "cell phones" and in particular to "Samsung" cell phones—thereby improperly inserting the desired answer to his survey questions into the screening process. *Id.* Ex. A ¶¶ 23-24, Ex. 3[1] at pp. 23, 25-27. For example, in the screening question on page 26 of the Keegan Exhibits, respondents were asked, "Which of the following types of cell phones have you shopped for in the last three years?" and one of the options was "Android (*Samsung*, Google Pixel, etc.)." *Id.* Ex. A at Ex. 3 at p. 26 (emphasis added). In his report, Keegan provided no explanation for why these screening questions were needed or appropriate in a reverse confusion survey that is supposed to focus on S10 Entertainment's actual or likely customers.

---

[1] "Ex.3" is a reference to Exhibit 3 of the Keegan Report.

*Id.* Ex. A ¶ 24. His deposition shed no useful light on the issue. *See id*. Ex. E at 27:5-9, 44:4-47:5.

Survey respondents were then instructed to "Please consider this name" and were shown the "S10" name followed by an open-ended description:

## S10

This name is used for a range of services related to music and entertainment, including management of performing artists, artist representation and marketing, production of music and music videos, organizing live musical performances, producing and distributing digital music content, and other related services.

*You will be able to advance after 10 seconds have passed.*

*Id.* Ex. A at Ex. 3 at p. 28. This stimulus does not show respondents the S10 mark as used by S10 Entertainment in the marketplace. *Id.* Ex. A ¶ 3; Ex. E at 53:12-15; Ex. D ¶¶ 61-64. Rather, Keegan used a stimulus of his own making despite having access to numerous examples of S10 Entertainment's use of the "S10" mark in the real-world. *Id.* Ex. D ¶ 62, Ex. 4 at pp. 9-18 (excerpting www.s10e.com amongst others).

Keegan next asked respondents the question: "If you know, *what company uses the name you saw*?" *Id.* Ex. A at Ex. 3 at p. 32 (emphasis added). "Samsung" (or Chevrolet, i.e., Chevy S-10 pickup) is a correct answer to this needlessly vague survey question. And, of course, correctly answering a question about use of a name says nothing about whether any consumers are confused about the source, affiliation, or sponsorship of S10 Entertainment's offerings.

This question format was also contrary to the accepted *Eveready* format, which asks, "Who do you think puts out [allegedly infringing mark/product]?" *Id.* Ex. A ¶ 32, fn. 18; *see also* Jerre B. Swann, Likelihood of Confusion Studies and the Straitened Scope of Squirt, 98 TRADEMARK REP. 739, 741 (2008). As further explained below, under the *Eveready* survey format, some direct reference in the question is made to the service or product at issue. *See, e.g.*, Eric D. DeRosia, *Fixing Ever-Ready: Repairing and Standardizing the Traditional Survey Measure of*

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN
- 4 -
CASE NO. 2:21-CV-02443-CAS-JPRX

*Consumer Confusion*, 53 Ga. L. Rev. 613, 645-646 (2019). It is critical to the *Eveready* survey format to ensure that respondents answer the right question. Keegan could easily have followed this format by asking, for example, "[w]hat company makes or puts out the music and entertainment services that you read about on the prior page," Perry Decl., Ex. D ¶ 48, but chose not to do so.

Keegan followed this question by asking a second question: "What makes you say that [verbatim response] uses the name you just saw?" *Id.* Ex. A at Ex. 3 at p. 33. As would be expected given the flawed and vague nature of the first question, responses to the "why" question reveal that respondents were simply identifying companies that "used" an S10 name—exactly as the question would logically be read to call for. For example, six respondents identified Chevrolet or made reference to Chevrolet S-10 pick-up trucks. *Id.* Ex. D ¶ 45; *see also id.* Ex. F. Such responses make sense only if respondents thought they were being called to answer the simple question of what company uses the name "S10," which is all Keegan's survey question asked.

If Keegan's question was truly surveying confusion as to the source, sponsorship, or affiliation of S10 Entertainment's offerings, at least some responses linking Samsung to those services would logically be expected. *Id.* Ex. A ¶ 59 (showing the complete list of Samsung-related responses)); *id.* Ex. D ¶ 50. But with respect to Samsung and the Galaxy S10 smartphone, the verbatim responses to this second question make no reference—*none*—to Samsung as the source or sponsor of S10 Entertainment's music-related services. The complete list of verbatim responses to the "what company uses" question is shown below, and reading it is revealing of the flawed nature of Keegan's survey (*id.* Ex. A ¶ 59):

Table 3. Samsung mentions, test cell (S10), "What company…"

| Response ID | Q18 (verbatim) | Q20 (verbatim) |
|---|---|---|
| R_06zFEaD6ABulphv | Samsung | The galaxy s10 |
| R_0VZLDnRK6VQS3TP | Samsung | Don't know / No opinion |
| R_1dgdI7y4KRAY3sD | Samsung | Galaxy s series has an S10 model phone in it |
| R_1ezPAik71ZNjbij | Samsung | There's a Samsung Galaxy S10 |
| R_1FqV5DBqOVLmNi0 | Samsung Galaxy S10 | Because they literally have a phone called the Samsung Galaxy S10 it was advertised heavily on television and online. |
| R_1IE4y8EaMhUkvgf | Samsung | S10 is the name of one of their models of phone. |
| R_1IQLarotU5c1XYv | I think it's the name of a Samsung Galaxy phone type | I believe the S series stands for Samsung and they have released several versions of them now |
| R_1KkAk7K0w9AtvQ0 | Samsung | I'm an owner of a Samsung S10 |
| R_1PbN9S2C4quqCgc | chevy, samsung galaxy | was amodelof a chevy small pickup truck, and a samsung cell phone? |
| R_22kRJz21g3RaMzQ | Samsung | S s stands for samsung |
| R_22srAZsXmAXKr5E | Galaxy mobile phone | Because I used to own one |
| R_24NkUb2NTgVoO40 | Samsung | The brand that carries the model |
| R_25BLwaPhkA1Y7jj | Samsung Galaxy is the one which uses the name S10 | S10 is a phone model from Samsung and hence I believe they do use the name |

| | | |
|---|---|---|
| R_264sLrZsRyRlTes | Samsung | I have heard it on an advertisement. |
| R_2Csw6wKPQqtlIje | Galaxy s10 is the regular way to put it and its awesome | Because its less confusing and its for thus to move forward with my questions of this survey robot sir |
| R_2Cyv4xLVkXuly7v | Samsung I think it's a phone model | I think I had that model before |
| R_2D7C3OWDjgR34Wl | Samsung | Because I have onward it is an s9 |
| R_2QPQUZpaKEC5n4n | Galaxy | It's actually Samsung Galaxy S10 because I used to have one. |
| R_2uVhqBSWaO7eTCS | Samsung | This is a type of phone that they produce. |
| R_2v01t5clVmQkys | samsung, they use it on their line of phones | because they do |
| R_2xW2ygLbURTQs1v | S10e | They have a website devoted to artists |
| R_2ykE9THWKsXk4yC | Roc Nation; it is local talent company owned by Jay Z and I am familiar because they are suing Samsung which also happens to be phone I own | I purchased my Samsung phone at ATT store, a loyal customer; and I subscribe to Billboard which contains several articles referencing S10 lawsuit |
| R_3067WtjpFFpbX4Z | Samsung | I thought a Galaxy S10 is a phone |
| R_325vmpAC9grfUDU | Samsung | I used to have an s10 phone. |
| R_3EdBjUnVQMClso | Samsung galaxy | Used this phone |
| R_3fcwLMPSxfvTQSP | Samsung | They have a series of phones called Galaxy s10 |
| R_3GAHD7JRokUS7ws | samsung cellular phones | because there is the gslaxey s10 |
| R_3h6HXVrO12srUyY | Galaxy samsung | All their phones are is s something like for example galaxy s22 |
| R_3HOF4ThVQ0JjBsU | Android | Have had seen the s10 smartphone |
| R_3issgg60MLXRAj6 | Samsung. They have their Android Galaxy cell phone S line. | I have a Samsung Galaxy. I have consistently upgraded to newer versions over the years so I know firsthand. |
| R_3L21OitEKWWWili | Samsung | Because its shows S-10 in pervious page. |
| R_3ly8xst12oVGPER | Sam | The s |
| R_3m8IDafwu1Ltu4x | Galaxy | I think there is a galaxy s10 cellphone |
| R_3MnYHRaVbyGtW3r | Samsung | I own a samsung s10 |

| | | |
|---|---|---|
| R_3nftcHxkqSnta8G | Samsung | I know they have electronics with names starting with the letter S. |
| R_3oBpbwCHKthadi7 | Galaxy is a phone from samsung and i think they have an s10 | When i think of galaxy phones i think of s10 |
| R_3P6v7Z2lPTozc45 | Samsung | S10 brand |
| R_3RpuK6JKa51zJwg | Samsung. I always see Samsung Galaxy S10 or S numbers | Because of the products with similar names |
| R_5oFMJ8jCbqwahoZ | Samsung because the samsung s10 is one of the phone series | Because samsung made a phone called Samsung galaxy s10 |
| R_9H3buY9N2l8cBqx | Samsung Galaxy S 10 | Proven and tested |
| R_9n23wfjAgwotFpT | Samsung Galaxy | I've heard of it before |
| R_CaJBf3cKPIW2ru1 | Samsung | Samsung uses those types of names for their cell phones |
| R_O8TqwJqTp19VovT | Samsung | Don't know / No opinion |
| R_Og8lwo45KeqFydX | Samsung | It's a type of phone |
| R_Pte6GlqfhefcrGh | I believe Samsung uses this. I only say this because it reminds me of the phone name galaxy s10 | It is really what my mind thought of when seeing the S10. |
| R_TiwlAqDdnPoAt7r | Samsung | Their product |
| R_TpVFVslYTyhjbTb | Samsung | I remember seeing a model S10 for a Samsung cell phone. |
| R_u2DOuvzBNzQZqdX | Hm... I think it might be Samsung? Samsung Galaxy phone? At first I wasn't sure and was writing that, but then, I remember hearing folks referring to the S10 and that's an Android Phone. | This was the same question you asked on the previous page??? "Hm... I think it might be Samsung? Samsung Galaxy phone? At first I wasn't sure and was writing that, but then, I remember hearing folks referring to the S10 and that's an Android Phone. " |
| R_Uc4umjf2OiQNV6N | samsung | I believe their phones are called S# |
| R_UWLWBDkQ160yAuZ | Samsung | That's the S brand |
| R_ZDCWZpgxvNca9fH | The only brand that comes to mind is the Samsung Galaxy s10 phone. Rather than that, I hsve never seen or heard about this specific symbol. | I can't really say enough about it to emphasize anymore clearly. I only know of the Samsung S10 cell phone. |
| R_2Qh9mcxdZRylVX4 | S10 | Samsung Galaxy S10 |

Keegan ultimately concludes that 54 respondents "identified Samsung across all likelihood of confusion measures." *Id.* Ex. A ¶ 65. All but two of these 54 respondents were counted as having "identified Samsung" based on these first two substantive (and inherently flawed) questions. *See id.* Ex. A ¶ 59 (identifying 52 responses that "mentioned Samsung" in response to the first two substantive survey questions); *see also id.* Ex. F.

On top of this, it bears noting that several of Keegan's scoring decisions were manifestly incorrect. For example, Keegan counts the following two responses as identifying Samsung, even though the responses plainly reference S10 Entertainment and its business partner Roc Nation, and do not reflect any consumer confusion:

| R_2xW2ygLbURTQs1v | S10e | They have a website devoted to artists |
| R_2ykE9THWKsXk4yC | Roc Nation; it is local talent company owned by Jay Z and I am familiar because they are suing Samsung which also happens to be phone I own | I purchased my Samsung phone at ATT store, a loyal customer; and I subscribe to Billboard which contains several articles referencing S10 lawsuit |

*Id.* Ex. A ¶ 59. To be clear, S10 Entertainment's website is www.s10e.com, and Roc Nation is S10 Entertainment's business partner.

Accounting for his control cell, Keegan concluded that 26.7% of respondents demonstrated "reverse confusion," resulting in his opinion of a "material likelihood of confusion." *Id.* Ex. A ¶ 69-70. But as explained above and further discussed below, Keegan did not actually survey confusion. Instead, his results merely reflect consumer recognition of Samsung's Galaxy S10 smartphone, as confirmed by Samsung's own data which just months before Keegan's survey found about ███ consumer recognition for the Galaxy S10 in the United States.  Perry Decl. Ex. G (showing ███ awareness of Galaxy S10 in January 2022 in the United States).

## III.    Legal Standard

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the framework governing the admissibility of expert testimony. Under Rule 702, trial judges should exclude expert testimony where the proposed testimony would be unhelpful, irrelevant, or is not the product of reliable methods. *See Daubert*, 509 U.S. at 589-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-52 (1999). The party asserting the admissibility of expert testimony bears the burden of demonstrating, by a preponderance of the evidence, that the testimony satisfies the requirements of Rule 702. Fed. R. Evid. 702 advisory committee's note. Thus, although Samsung is the moving party, S10 Entertainment bears the burden of

establishing that the Keegan Survey and Keegan's related testimony are admissible.

Even if the requirements of Rule 702 are satisfied, an expert's testimony still should be excluded if the probative value of that testimony is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

With respect to surveys, courts have not hesitated to exclude surveys, where, as here, they survey the wrong universe, do not actually survey confusion, are improperly leading, or do not apply a well-accepted methodology.  *See, e.g.*, *Kudos Inc. v. Kudoboard LLC,* No. 20-CV-01876-SI, 2021 WL 5415258, at *11 (N.D. Cal. Nov. 20, 2021) (***Keegan's*** survey excluded because he surveyed the wrong universe and improperly presented leading questions); *Beyond Blond Prods., LLC v. Heldman*, No. CV205581DSFGJSX, 2021 WL 4860376, at *1 (C.D. Cal. Aug. 13, 2021), *aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX, LLC,* No. 21-55990, 2022 WL 1101756 (9th Cir. Apr. 13, 2022) (***Keegan's*** survey excluded due to failure to measure whether the confusion was specifically attributable to the design elements at issue); *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437, 454 (D.S.C. 2019) (***Keegan's*** survey excluded because it surveyed the wrong universe and improperly excluded highly relevant respondents)[2]; *Reinsdorf v. Sketchers U.S.A.* 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) (survey excluded due to improper universe and leading design); *Brighton*

---

[2] In addition to courts excluding Keegan's surveys (*Kudos*, *Beyond Blond Produdcts,* and *vonRosenberg*), other courts have expressed serious concerns regarding Keegan's reports and opinions. *See Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp. 3d 588, 596 (N.D. Ohio 2019) (***Keegan's*** survey afforded little to no weight due to the use of weak controls and his failure to meaningfully address background noise); *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 582 (S.D.N.Y. 2015) (court "troubled by what appears to be a large amount of cutting and pasting between a prior report and [***Keegan's*** rebuttal] report"—which could potentially reflect "off-the-shelf criticism").

*Collectibles, Inc. v. RX Tex. Leather Mfg.*, 923 F. Supp. 2d 1245 (S.D. Cal. 2013) (survey excluded due to leading design); *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) (excluding survey that used the incorrect universe); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 745 (S.D.N.Y. 2011), *on reconsideration in part,* No. 09 CIV. 4373 SAS, 2011 WL 6326032 (S.D.N.Y. Dec. 16, 2011) (excluding *Eveready* survey because it "failed substantially to reflect actual marketplace conditions"); *CSL Silicones, Inc. v. Midsun Grp. Inc.*, No. 3:14-CV-1897 (CSH), 2017 WL 6055380, at *8 (D. Conn. Dec. 7, 2017) (excluding *Eveready* survey because "[t]he errors in selecting the universe of participants for the survey are sufficient to render the survey inadmissible as it pertains to any evidence of market recognition or likelihood of confusion" with respect to one of several marks at issue).

## IV. Keegan's Survey Is Unreliable, Did Not Conform to the *Eveready* Format, Did Not Test for Reverse Confusion, and Should Be Excluded

Keegan purports to have created a "national consumer study to measure reverse confusion using the Eveready format." Perry Decl. Ex. A ¶ 5. The *Eveready* survey format was first approved by the Seventh Circuit in *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 387 (7th Cir. 1976). When done correctly, it is recognized as a valid measure of confusion by courts in every federal circuit, including the Central District of California. *See, e.g., Allstate Ins. Co. v. Kia Motors Am., Inc.*, No. 16-cv-06108-SJO (AGRx), 2017 WL 10311211, at *5 (C.D. Cal. Sept. 20, 2017) (quoting 6 J. Thomas McCarthy, Trademarks & Unfair Competition § 32:173.50 (4th ed.) (stating that "in cases involving strong marks, the Eveready test should be considered the gold standard for fundamental cognitive and marketing reasons").

A crucial first step in an *Eveready* survey is the selection of an appropriate universe. In a reverse confusion context, this means surveying *S10 Entertainment's* actual or likely customers, not Samsung's consumers or an otherwise overly broad universe. *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 ("Where, as here, the

relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user, it is appropriate to survey the senior user's customers."). Another critical aspect of survey design is "that respondents are not made 'artificially aware' of the other party's trademark." *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, No. 06 Civ. 550 (JFK), 2007 BL 78876, at *9 (S.D.N.Y. Aug. 6, 2007). Further, the mark must be shown to respondents in a manner that as closely as possible reflects how the actual or likely consumers would encounter it in the marketplace. *See Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 464 (E.D. Va. 2017) (citing 6 McCarthy on Trademarks & Unfair Competition § 32:173 (4th ed. 2014)), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) (noting that under the *Eveready* methodology, "the respondent is shown the entire mark as used in the marketplace"). Finally, as Keegan notes, an *Eveready* survey uses an open-ended question format that displays a product or reflects a service and asks the respondent to indicate who they think makes, puts out, or provides the trademarked product or service in question. Perry Decl., Ex. A ¶ 32; *Union Carbide*, 531 F.2d at 387.

Keegan's survey comports with none of these imperatives for having a reliable *Eveready* survey and, worse, does not actually probe confusion. Thus, respectfully, his survey should be excluded. *See supra* Part III (citing myriad cases in which surveys have been excluded on these bases).

## A.    Keegan Surveyed an Overly Broad and Largely Irrelevant Universe

S10 Entertainment uses its S10 mark in connection with "music management services." Perry Decl. Ex. A ¶ 4. Keegan, however, surveyed a universe that departs significantly from S10 Entertainment's actual or likely purchasers. Instead of directing his survey to recording artists, writers in the music industry, or other clients or partners that S10 Entertainment may seek, Keegan qualified respondents as likely purchasers of S10 Entertainment's services if they indicated that they were "currently primarily employed in either entertainment or entertainment management," without

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN

- 12 -

CASE NO. 2:21-CV-02443-CAS-JPRX

any limitations or qualification on the nature of such employment *Id.* Ex. A ¶ 22. About 25% of the respondents qualified in this manner. *Id.* Ex. E at 32:14-21.

General employment in entertainment or entertainment management does not qualify a respondent as an actual or likely purchaser of S10 Entertainment's specific services and captures individuals far afield from its actual or likely purchasers. Keegan recognized as much in his deposition:

> Q.   So people primarily employed in entertainment or entertainment management could include, for example, people who work in data analysis for an entertainment company, is that correct?
>
> A.   Yes.
>
> Q.   It could theoretically include a ticket-taker at a Disney theme park, correct?
>
> A.   I'm not sure I would agree with that.
>
> Q.   And why would you not agree with that?
>
> A.   I don't know how that person would identify their employment.
>
> …
>
> Q.   But in your survey, if that person identified their industry as entertainment or entertainment management, they would have qualified for the survey, correct?
>
> A.   Yes.

*Id.* Ex. E at 33:15-34:11. The raw data for the respondents also bears this out. Amongst those who qualified to participate in the survey based on working in entertainment or entertainment management were (i) two customer service agents; (ii) an adult entertainer; (iii) a human resources officer; (iv) a twitch streamer; (v) a videogame streamer; (vi) an "assistant to the assistant manager"[3]; (vii) a data analyst; (viii) an assistant; and (ix) an executive assistant. *Id.* Ex. F.

---

[3] This seems possibly to be a reference to an episode of NBC's *The Office* in which Jim Halpert convinces Dwight Schrute that he needs to choose someone to act as an Assistant to the Assistant to the Regional Manager and the two subsequently hold tryouts for the position.

Worse, about 75% of the qualifying respondents were comprised of what Keegan refers to as those "likely to have exposure to [S10 Entertainment's] mark via their interest in the types of music produced by S10 Entertainment." *Id.* Ex. A ¶ 22. To this end, Keegan qualified respondents who, within the prior year, had listened to music in the genres of modern pop, modern R&B, modern rap and/or Latin.[4] Keegan in no way demonstrated why or how any material number of respondents listening to these various genres of popular music would by virtue of simply listening to that music have any exposure to S10 Entertainment's mark.

This is all the more so given that Keegan's survey does not require that respondents (i) had listened to music performed or created by any of S10 Entertainment's clients; (ii) had any likelihood whatsoever of having exposure to S10 Entertainment's mark due to listening to these broad categories of music; (iii) had any choice in selecting the music in question; or (iv) possessed any interest in the particular music being played. *Id*. Ex. D. ¶¶ 74-75. For example, a restaurant patron who passively listens to modern pop music played in the dining room of Applebee's would qualify for the Keegan Survey. *Id*. Ex. D at ¶ 75. This overbroad universe was improper and that alone requires that the Keegan Survey be excluded. *Kudos Inc.,* 2021 WL 5415258, at *11 (concluding that Keegan erroneously relied on a survey of "current users of employee recognition software rather than prospective buyers" and excluding it on that basis); *see also Reinsdorf,* 922 F. Supp. 2d at 878 (survey excluded due to improper universe and leading design); *Kwan Software Eng'g,* 2014 WL 572290, at *4  (excluding survey that used the incorrect universe); *vonRosenberg v. Lawrence,* 413 F. Supp. 3d at 454 (excluding a survey conducted by Keegan for failing

---

[4] While non-consumer confusion may in certain situations bear on the question of likelihood of confusion, proper reliance on non-consumers "depends on how the groups are situated in relation to one another" and on demonstrating that such non-consumers would actually impact the purchasing decisions of the relevant consumers. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012). Here, Keegan provided no explanation or basis to include "non-consumers" in the same test cell as consumers, rendering his inclusion of these two distinctly different sets of consumers in the same test cell fundamentally problematic.

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN          - 14 -          CASE NO. 2:21-CV-02443-CAS-JPRX

1  to capture the correct universe); *CSL Silicones, Inc.* 2017 WL 6055380, at *8

2  (excluding *Eveready* survey due to errors in selection of survey universe).

3  **B. Contrary to Accepted *Eveready* Survey Design, The Keegan Survey**

4  **Used Leading Qualification Questions To Introduce Samsung and Bias the Results**

5  The Keegan Survey improperly stacks the deck by introducing the product

6  category of cell phones, and "Samsung" specifically, to respondents through a series

7  of qualification questions that are irrelevant to finding actual or likely purchasers of

8  S10 Entertainment's services.  *See Kargo Global, Inc.,* 2007 WL 78876, at *9

9  (respondents should "not [be] made 'artificially aware' of the other party's

10  trademark"). In asking respondents about cell phones, as well as presenting to

11  respondents the "Samsung" name prior to asking the substantive questions, Keegan

12  designed a leading survey having improper "demand effects." Demand effects are

13  produced when respondents "use cues from the survey procedures and questions to

14  infer the purpose of the survey and identify the 'correct' answers." 4 McCarthy on

15  Trademarks & Unfair Competition § 32:172 (5th ed.); *see also Simon Prop. Grp. LP*

16  *v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000) ("'[D]emand

17  effects' . . . bias the survey by suggesting to respondents, at least implicitly, that they

18  should believe there is at least some sort of relationship between the different items

19  when the possibility might not even have occurred to the vast majority of consumers

20  who see the items.").

21  This improper biasing begins with question 9, which asks respondents how they

22  have listened to music in the last year. One of the options provided is "Streaming

23  service (e.g. YouTube, Spotify) *on mobile devices*." Perry Decl. Ex. A at Ex. 3 at p.

24  53 (emphasis added). Question 11 then requires respondents to select which consumer

25  electronics products they have shopped for in the last three years, despite the fact that

26  S10 Entertainment is not a consumer electronics company. *Id.* Ex. A at Ex. 3, p. 55.

27  The response options included a cell phone, and, inexplicably, only those respondents

28  who selected that option were qualified to proceed in the survey. *Id.* Ex. A at Ex. 3 at

p. 55. In question 12, Keegan then queried respondents on the type of cell phone respondents shopped for, with one option expressly including the "Samsung" name ("Android (*Samsung*, Google Pixel, etc.)"). *Id.* Ex. A. at Ex. 3 at p. 56 (emphasis added). Finally, in question 13, respondents are asked to consider whether they have taken any surveys regarding cell phones in the last month. *Id.*

Tellingly, during his deposition, Keegan admitted that this series of questions was irrelevant to determining if a respondent was a likely purchaser of S10 Entertainment's services:

> Q.    So you wouldn't need exposure to the cell phone market to be a likely purchaser of S10Entertainment's music management and production services, correct?
>
> A.    Not necessarily, correct.

*Id*. Ex. E at 27:5-9. There is no legitimate purpose for Keegan's leading survey design, and numerous courts have recognized that leading questions like this bias responses toward the answer the survey designer hopes to get, i.e., "Samsung" in this case. This is fundamentally improper and contrary to reliable, acceptable survey design. *See Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey based in part on its leading design because the "inquiry was an obvious leading question in that it suggested its own answer. The participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations."); *Kudos Inc.*, 2021 WL 5415258, at *11 (N.D. Cal. Nov. 20, 2021) (***Keegan's*** survey excluded because he surveyed the wrong universe and improperly presented leading questions); *Brighton Collectibles, Inc..*, 923 F. Supp. 2d 1245 (survey excluded due to leading design). For this reason, too, the Keegan Survey should be excluded.

## C.    Contrary to Accepted *Eveready* Survey Design, the Keegan Survey Does Not Use Stimuli That Replicate Marketplace Conditions

Keegan admits that for an *Eveready* survey it is "important that the stimulus

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN
- 16 -
CASE NO. 2:21-CV-02443-CAS-JPRX

simulate market conditions as closely as possible":

> Q. And in an Eveready survey with a single stimulus, it's important that the stimulus simulate market conditions as closely as possible, correct?
>
> A. Yes.

Perry Decl. Ex. E at 43:12-15; *see also Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 435 (E.D. Pa. 2012) (showing accused mark without accompanying logo "undermines the effectiveness of the survey"). The failure of a survey to "approximate actual marketplace conditions can provide grounds for inadmissibility." *Kwan Software Eng'g,* 2014 WL 572290, at *4 (quoting *Medisim Ltd. v. BestMed LLC,* 861 F.Supp.2d 158, 166 (S.D.N.Y. 2012)); *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010) (same); *Gucci America, Inc.,* 831 F. Supp. 2d at 745 ("[A] survey's failure to reflect actual marketplace conditions is a serious matter that may, in light of other factors, lead to the survey's exclusion from evidence.").

As S10 Entertainment itself notes, S10 Entertainment has become known through its "Twitter account (@S10ent), Instagram account (@s10), and website (S10e.com)." Dkt No. 37, ¶ 30. As shown in these sources, the S10 mark as used in the marketplace includes boxy yellow text appearing over a black background and often features detailed descriptors of its services. Rather than using these readily available marketplace stimuli, Keegan used a stimulus of his own-making which had a different font, color scheme, and presentation of "S10" compared to what S10 Entertainment uses in the marketplace:



Perry Decl. Ex. D ¶¶ 61-65.

Keegan offers no coherent justification for this choice:

> Q.  What likely purchaser of S10 Entertainment's services would ever see the mark presented in plain type with a description of the categories of services allegedly provided by the Plaintiff?
>
> A.  Well, my review of my client's use of their mark on their website mostly indicated a particular font style that in some ways was nearly identical as the Samsung font style. And their webpage, in my estimation, didn't always

communicate the range of their services clearly. . . . I wanted to be clear to respondents. I wanted to be true to the registration here for the mark. So I felt that the best presentation, the most conservative presentation, would be to present this mark in a plain font, not the font that they're currently using, that both parties in this case appear to be using, but in a plain font with a full description so that it was clear to respondents what my client does.

Perry Decl. Ex. E at 54:18-55:12.

Keegan does not explain why it was necessary to stay "true" to the plain text registration or how this was somehow "conservative." Indeed, the proper *Eveready* survey format requires something different: when there are actual uses of a mark in the marketplace, *Eveready* survey design demands they be used. *See Combe Inc. v. Dr. Aug. Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 463 (E.D. Va. 2019), *aff'd*, 851 F. App'x 357 (4th Cir. 2021) ("[I]n the context of a trademark infringement claim, a likelihood of confusion survey must replicate market conditions."). It also makes no sense to claim that S10 Entertainment's descriptions of its services on its own website and social media are not sufficiently clear for purposes of this case, when that is *exactly* how actual or potential consumers would encounter them in the marketplace.

In short, Keegan made a fundamentally improper choice of stimulus and then sought to justify that choice with hollow rhetoric that is contrary to well-settled law around the proper *Eveready* survey format. Keegan's failure to replicate marketplace conditions compounds the unreliability of this survey and further compels its exclusion. *Kwan Software Eng'g,* 2014 WL 572290, at *4.

> ### D.   Keegan's Survey of "Use" of the S10 Name Does Not Measure Confusion and Is Not an Accepted Variant of the *Eveready* Format

Perhaps most problematically, Keegan's first substantive question does not follow the accepted *Eveready* format and renders his survey irrelevant to the issue of reverse confusion. Specifically, Keegan asks respondents "*what company uses the*

1  *name you saw?*" in reference to the name "S10." Perry Decl. Ex. A ¶ 32, fn. 19
2  (emphasis added). Because the question makes reference only to the name S10, a true
3  and correct response to this question is quite literally "Samsung" or "Chevrolet,"
4  exactly as several respondents answered.

5       If there were any doubt that respondents answered this question literally—with
6  no confusion relating to the source, sponsorship, or affiliation of S10 Entertainment's
7  services—the verbatims remove all doubt. *None* of the respondents who identified
8  Samsung in response to the first substantive question made any reference to a belief
9  that Samsung put out the services described under the S10 name in the prior question.
10  Rather, as their responses make clear, respondents who named Samsung did so
11  because they were aware of Samsung's Galaxy S series of smartphones and the
12  Galaxy S10. The full list of responses is *supra* at Part II, but as just a few examples to
13  illustrate the point, respondents stated the following for why they named Samsung:

| Response ID | Q18: What company uses the name you saw? | Q20: What makes you say that? |
|---|---|---|
| R_06zFEaD6ABuIphv | Samsung | The galaxy s10 |
| R_1dgdl7y4KRAY3sD | Samsung | Galaxy s series has an S10 model phone in it |
| R_1ezPAik71ZNjbij | Samsung | There's a Samsung Galaxy S10 |
| R_1FqV5DBqOVLmNi0 | Samsung Galaxy S10 | Because they literally have a phone called the Samsung Galaxy S10 it was advertised heavily on television and online. |
| R_1IE4y8EaMhUkvgf | Samsung | S10 is the name of one of their models of phone. |
| R_1KkAk7K0w9AtvQ0 | Samsung | I'm an owner of a Samsung S10 |

26  *Id.* Ex. D ¶¶ 49-50; *see also id.* Ex. A ¶ 59. It is inexcusable that Keegan neither
27  mentions nor grapples with the fact that the verbatims clearly show that respondents
28  naming Samsung were not confused at all and in no way suggested through their

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK KEEGAN          - 20 -          CASE NO. 2:21-CV-02443-CAS-JPRX

responses that they falsely believed S10 Entertainment's services come from or were sponsored or affiliated with Samsung.

Further to this point, it is well established that merely "calling to mind" another's use of a name or designation is not trademark confusion. *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1083 (9th Cir. 2005) (evidence that a witness was reminded of plaintiff's mark when observing defendant's ad was not sufficient evidence of confusion); *see also Yellowfin Yachts, Inc. v. Barker Boatworks*, LLC, 898 F.3d 1279, 1295 (11th Cir. 2018) (trade dress that merely calls to mind senior user is not infringement); *Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1010 (8th Cir. 2005) (stimulus that reminds respondents of defendant is not probative of confusion); *Univ. Of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 1374 (Fed. Cir. 1983) (likelihood of confusion "means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another").

Rather, Keegan's results are akin to what one would expect in connection with a brand awareness survey. Significantly, the result that Keegan generated (26.7%) is strikingly similar to Samsung's own results when it conducted a consumer recognition survey of the Samsung Galaxy S10 smartphone in the United States, which resulted in a finding of ▮▮▮ awareness. Perry Decl. Ex. G; *see also id.* Ex. D ¶¶ 45-50.

Further demonstrating the significance and fundamental error in Keegan's departure from an accepted *Eveready* question format, in the article *Fixing Ever-Ready: Repairing and Standardizing the Traditional Survey Measure of Consumer Confusion*, 53 GA. L. REV. 613, 645-46 (2019), marketing professor Eric D. DeRosia studied variations of the *Eveready* question that have been accepted by courts. DeRosia compiled these examples to analyze the effects variations in the wording of the first *Eveready* question had on survey outcomes. *See id.* Notably, all variations had both a source referent ("who," "what company," etc.) *and* a product/service referent ("this product," "these shoes," etc.). *Id*. at 645-46. Here, Keegan's first

*Eveready* question lacks a product/service referent, and that is fatal to his survey design.

In short, the Keegan Survey is fundamentally flawed and provides no reliable data relevant to the reverse confusion question it purports to address. The survey is inadmissible under Rule 702 and, at the very least, any minimal probative value it may offer is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; *see also Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir.1999) (district court did not abuse its discretion when it excluded confusion survey under rule 403 because its probative value was so slight that it was outweighed by its prejudicial effect); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039, 1052 (S.D. Ind. 2000) (noting that "surveys that are seriously flawed warrant exclusion" and excluding confusion surveys under Rule 403 because "the results are likely to create unfair prejudice, confuse the issues, waste time, and mislead the jury"); *Jacobs v. Fareportal, Inc.*, No. 8:17CV362, 2020 WL 6587245, at *10 (D. Neb. May 29, 2020) ("While perhaps not grounds for exclusion when each is taken in isolation, an accumulation of errors can be an expert witness's downfall."); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 631 (S.D.N.Y. 2007) (each flaw "decreases . . . reliability and probative value and correspondingly increases . . . prejudicial effect).

## V.    Conclusion

For the reasons stated herein, Samsung respectfully requests that this Motion be granted and that the Keegan Survey and his testimony and opinions be excluded.

1
2

3   Dated: December 23, 2022

**FAEGRE DRINKER BIDDLE & REATH LLP**

By: */s/ Christopher J. Burrell*

4

David J.F. Gross

5
6

James R. Steffen (*pro hac vice*)
james.steffen@faegredrinker.com

7

Lauren W. Linderman (SBN 280809)
lauren.linderman@faegredrinker.com
2200 Wells Fargo Center

8

90 S. Seventh Street
Minneapolis, Minnesota 55402

9

Telephone:   +1 612 766 7000

10

Christopher J. Burrell (*pro hac vice*)
christopher.burrell@faegredrinker.com

11

Katlyn M. Moseley (*pro hac vice*)
katlyn.moseley@faegredrinker.com

12

1500 K Street NW, Suite 1100
Washington, D.C. 20005

13

Telephone:   +1 202 842 8800

14

Louis T. Perry (*pro hac vice*)
louis.perry@faegredrinker.com

15

300 N. Meridian Street, Suite 2500
Indianapolis, Indiana 46204

16

Telephone:   +1 317 237 0300

17

*Attorneys for Defendant/Counterclaimant*
Samsung Electronics Co., Ltd., and

18

*Defendant* Samsung Electronics America, Inc.

19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I, Christopher J. Burrell, declare that on **December 26, 2022** I caused the foregoing Defendants' Corrected Motion to Exclude Evidence and Testimony from Mark Keegan to be served on the interested party(ies) in this action as follows:

****

☐    **BY EMAIL:**  by transmitting via e-mail or secure file transfer the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

Andrew D. Skale
*adskale@mintz.com*
Matthew C. Hurley
*mchurley@mintz.com*
Michael R. Graif
*Mrgraif@mintz.com*
Geoffrey A. Friedman
*gafriedman@mintz.com*
James J. Thomson
*jjthomson@mintz.com*
Oliver Ennis
*ofennis@mintz.com*
**MINTZ LEVIN COHN FERRIS**
**GLOVSKY AND POPEO, P.C.**
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
Tel.  (858) 314-1500

Matthew Novian
*mjnovian@mintz.com*
**MINTZ LEVIN COHN FERRIS**
**GLOVSKY AND POPEO, P.C.**
2029 Century Park East, Ste 3100
Los Angeles, CA 90067
Tel.  (310) 586-3200

Executed on **December 26, 2022**

*/s/ Christopher J. Burrell*
Christopher J. Burrell