**Redacted Version of Document
Proposed to be Filed Under Seal**

# EXHIBIT A

**Excerpts of Doug Bania
Deposition Transcript**

CONFIDENTIAL

```
                                                    Page 1

                CONFIDENTIAL -  ATTORNEYS' EYES ONLY
 1                   UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
 2
 3    S10 ENTERTAINMENT & MEDIA,    )
      LLC.,                         )Case No. 2:21-cv-2443-CAS-JPR
 4         Plaintiff,               )
                                    )
 5         vs.                      )Hon. Christina A. Snyder
                                    )
 6    SAMSUNG ELECTRONICS CO., LTD.;)
      SAMSUNG ELECTRONICS AMERICA,  )
 7    INC.,                         )
           Defendants.              )
 8    _____)
      SAMSUNG ELECTRONICS CO., LTD.,)
 9         Counterclaimant/         )
           Defendant,               )
10                                  )
           vs.                      )
11                                  )
      S10 ENTERTAINMENT & MEDIA,    )
12    LLC,                          )
           Counterclaim Defendant/  )
13         Plaintiff.               )
      _____)
14
15         The CONFIDENTIAL Videotaped Deposition of DOUG BANIA,
16    called by the Defendant/Counterclaimant for examination,
17    pursuant to Notice and pursuant to the Federal Rules of
18    Civil Procedure for the United States District Court
19    pertaining to the taking of depositions, taken before Leslie
20    Ann Krupchak, Certified Shorthand Reporter, Registered Merit
21    Reporter, CMRS, CPE, and a Notary Public within and for the
22    State of Illinois, appearing remotely via teleconference
23    from San Diego, California, commencing at the hour of
24    11:31 a.m. CST on the 8th day of December, 2022.
```

CONFIDENTIAL

Page 2

```
1      REMOTE APPEARANCES:
2
            MR. MICHAEL R. GRAIF
3      MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.,
       666 Third Avenue
4      16th Floor
       New York, New York 10017
5      (212) 935-3000
       mrgraif@mintz.com
6
            Appeared on behalf of the Plaintiff;
7
8           MR. DAVID J.F. GROSS
            MR. CHRISTOPHER BURRELL
9           MS. LAUREN LINDERMAN
            MS. KIRSTEN ELFSTRAND
10     FAEGRE DRINKER BIDDLE & REATH LLP
       1950 University Avenue
11     Suite 450
       East Palo Alto, California 94303
12     (650) 324-6700
       david.gross@faegredrinker.com
13     chris.burrell@faegredrinker.com
14          Appeared on behalf of the Defendants;
15
16
       ALSO PRESENT:
17
18          Mr. Thomas Munk
            Veritext Technical Concierge
19
            Mr. Michael Prager
20          Legal Videographer
            Veritext Legal Solutions
21
22
23
24
```

CONFIDENTIAL

Page 3

```
 1                         I N D E X

 2

 3        VIDEOCONFERENCE REMOTE DEPOSITION OF:  DOUG BANIA

 4

 5

                         DX        CX       RDX       RCX

 6

 7    BY MR. GROSS:   . . . 7 . . . . . . . . . . . . . . .

 8

 9

10                     DEPOSITION EXHIBITS

                          REFERRED TO

11

12    NUMBER                 DESCRIPTION              PAGE

                                               (Referred To)

13

      Exhibit 33      Email from Melnick, Gabriella

14                    To Jay Cao

                      6/13/2019                         146

15

16    Exhibit 284     Preliminary Opening Expert Report

                      Regarding Damages Issues

17                    October 7, 2022                   104

18

      Exhibit 285     Bakewell Expert Report of

19                    W. Christopher Bakewell            13

20

      Exhibit 286     Nevium LLC

21                    Expert Report of Doug Bania

                      October 7, 2022                    76

22

23    Exhibit 288     The Comprehensive Guide to

                      Economic Damages

24                    Sixth Edition, Volume One         179
```

Veritext Legal Solutions

CONFIDENTIAL

Page 4

1                DEPOSITION EXHIBITS (Continued)

                 MARKED FOR IDENTIFICATION

2

3    NUMBER               DESCRIPTION           PAGE

4

5    Exhibit 290     Nevium LLC - Expert Rebuttal Report

                   of Doug Bania           13

6

7    Exhibit 291     Exhibit A,

                   Table for Deposition     21

8

9    Exhibit 292     Schedule 4b

                   Profit Apportionment Analysis   71

10

11   Exhibit 293     Samsung Music Marketing

                   December 2015        111

12

13   Exhibit 294     Brophy v Almanzar, et al.,

                   Order Denying Defendants' Motion

14               for Summary Judgment    171

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 28

1    A.    The analyst working -- me or another analyst working

2          with this, yes, depending on the case, you could add or

3          remove.

4    Q.    And sir, approximately how many times in your career

5          have you applied a framework that involves

6          considerations that number approximately 17, give or

7          take?

8    A.    I would say the majority of using this matrix, I

9          consider the 17.

10   Q.    Okay.  And sir, do you have any idea in the past how

11         many times you've used this matrix in an apportionment

12         analysis in IP cases?

13   A.    Well, this matrix started out being used in

14         non-litigation.  So oftentimes as I've mentioned at the

15         beginning of my deposition, we're hired to value

16         intellectual property and say we are hired to valuate

17         trademark at a company.

18              I would use this matrix to determine, you know,

19         the value of the company, what percent of that value is

20         due to the trademark at issue.  So I've used this in

21         non-litigation -- you know, I haven't counted how many

22         times -- 50 to 100 times.  I've used this in litigation

23         maybe a dozen times.

24   Q.    Okay.  And in litigation, have you ever used it in a

CONFIDENTIAL

Page 29

1          trademark case before?

2     A.   Yes.

3     Q.   All right.  And do you have any idea how many of those

4          dozen or so times involved a trademark case?

5     A.   I've used -- I don't know offhand.  The majority of them

6          are used in trademark cases because really, my expertise

7          is copyrights, trademarks so the majority of them were

8          in trademark cases.  I don't know the exact number.

9     Q.   And Mr. Bania, have you used this matrix, the 17

10         consideration matrix, in a case where you are an expert

11         for the defendant who is accused of trademark

12         infringement?

13    A.   Yes.

14    Q.   And have you also used it in the past for a plaintiff

15         who is accusing a defendant of trademark infringement?

16    A.   Yes.

17    Q.   Okay.  And do you have any sense of the breakdown of how

18         many of your trademark cases have been the party

19         asserting trademark infringement and how many have been

20         the party who's defending against an allegation of

21         trademark infringement, if you know?

22    A.   I don't recall.

23    Q.   Okay.  And you mentioned that you used this matrix in

24         non-litigation settings to value trademarks; is that

CONFIDENTIAL

Page 32

1          maybe an industry I've worked in as it relates to using

2          this matrix --

3     Q.   Okay.

4     A.   -- or some examples, you know, without giving you the

5          name of the client or the company.

6     Q.   Great.

7              So I'm just going to ask you some questions and

8          then you let me know if you can tell me what I'm asking.

9          All right, sir?

10    A.   Sure.

11    Q.   All right.  So Mr. Bania, have you been hired by any

12         companies that involve consumer electronics to help them

13         assess the value of a trademark?

14    A.   Yes.

15    Q.   All right.  What companies in consumer electronics have

16         hired you?

17    A.   Then again, I can't give you those names.

18    Q.   Okay.  What consumer electronics products trademarks

19         have you analyzed that uses this 17 consideration matrix

20         that you can tell us?

21    A.   I could give you product, kind of a description, meaning

22         stereo speakers and portable speakers as it relates to a

23         consumer electronics client.

24    Q.   So you have done a non-litigation project for a

EXHIBIT A
PAGE 7

Page 64

1          put that on the chart.

2                Do you see that, sir?

3                MR. GRAIF:  Object to the form.

4                THE WITNESS:  Yeah.  Please repeat that.

5     BY MR. GROSS:

6     Q.  Yeah, sure.

7                Do you see where it says Count Number of

8          Considerations with Score of 2 --

9     A.  Yeah.

10    Q.  -- (No Scores Were greater than 2)?

11    A.  Yes.

12    Q.  That's consistent with our understanding for our

13         discussion of this hypothetical methodology that we're

14         in a situation where there are no scores greater than a

15         2.  All right, sir?

16    A.  As it relates to my analysis with this case, there are

17         no scores greater than a 2, that's correct.

18    Q.  Right.

19                And since you don't have any scores greater than a

20         2, I'm not going into hypotheticals that have any scores

21         greater than a 2.  All right, sir?

22    A.  Okay.

23    Q.  Okay.  So in this case, am I right that there was a

24         point where you reached an opinion that the number of

CONFIDENTIAL

Page 65

```
1            considerations that were greater than the minimum were

2            actually 3 and not 5?  You did reach that opinion in

3            this case, right, sir?

4    A.  My opinion in this case, there were five factors that

5            scored a 2.

6    Q.  Right.

7                But before you actually issued your written

8            opinion, you did arrive at an opinion that there were

9            only 3 considerations that warranted a 2 as opposed to

10           5.  Right, sir?

11   A.  No.

12   Q.  Prior to submitting your report, didn't you reach an

13           opinion that there were only 3 scores that had a 2,

14           rather than 5?

15               MR. GRAIF:  Objection.  Asked and answered.

16               THE WITNESS:  No.

17   BY MR. GROSS:

18   Q.  Well, sir, at any point in time in your analysis, did

19           you ever reach a point where you had the opinion that

20           there were 3 considerations that got a 2 as opposed to

21           5?

22   A.  My opinion has never been that there are 3 as opposed to

23           a 5.

24   Q.  Have you ever reached a tentative opinion that there are
```

CONFIDENTIAL

Page 66

```
 1           only 3 considerations that have a 2 as opposed to 5?
 2    A.   My opinions are in my report that we're looking at and
 3           there are 5 considerations.
 4    Q.   Prior to writing your report, did you ever have an
 5           opinion that there were only 3?
 6    A.   No.
 7    Q.   Did you ever change your opinion from 3 considerations
 8           that have a 2 to 5 considerations that have a 2?
 9    A.   No.
10           My final opinion is in my report and my matrix is
11           in my report.
12    Q.   Right.
13           But did you ever have a preliminary opinion before
14         you issued your final opinion where you believed that
15         there were only 3 considerations that warranted a 2?
16           MR. GRAIF:  Objection.  Asked and answered.
17           THE WITNESS:  No.
18    BY MR. GROSS:
19    Q.   Did you ever even consider at some point that we may be
20           in a situation where there are 3 considerations that
21           warrant a 2 but not 5?
22    A.   No.
23    Q.   Did you ever write anything down that you can remember
24           where you wrote something down and said I'm going to
```

CONFIDENTIAL

Page 67

1        write down 3 because I think there are 3 considerations

2        that warrant a 2 but not 5?

3            Did you ever write that down that you can remember

4        before you issued your final report?

5    A.  I'm seeing here on my Schedule 4b, number of 17

6        considerations with a score minimum.  It does say 3

7        there.

8    Q.  Well, Mr. Bania, is a 3 consistent with 4.4 percent or

9        7.4 percent?

10   A.  Well, the total score is a 22.  And then if you look at

11       the analysis, there are five.  So why that says 3 there

12       must be a typo.

13   Q.  Sir, a 3 -- a score of 3 is consistent with 4.4 percent,

14       not 7.4 percent.  Correct?

15   A.  My opinion is a total score of 22, which is 5

16       considerations, which is a 7.4 percent.

17   Q.  Well, let me take you up with what you just said,

18       Mr. Bania.

19           A score of 22 is consistent with 7.4 percent,

20       right, sir?

21   A.  That is correct.

22   Q.  Do you see Hypo F on my chart?

23   A.  I do.

24   Q.  Do you see 22?

CONFIDENTIAL

Page 68

1    A.  I do.

2    Q.  And do you see at the bottom of that it's 7.4 percent?

3    A.  I do.

4    Q.  So 22 is consistent with 7.4 percent.  Right, sir?

5              MR. GRAIF:  Objection.  Asked and answered.

6              THE WITNESS:  That's correct.

7    BY MR. GROSS:

8    Q.  Okay.  But 3, you agree with me for purposes of your

9         methodology, 3 -- you will agree with me -- is

10        consistent with 4.4 percent.  Reasonable?

11   A.  But irregardless of that, that is not my opinion.

12             There are 5 considerations.  The score is a 22 if

13        we look at your Hypo F, that is a 7.4 percent.

14             Again, I see a 3 here, it's a typo.  I apologize.

15        There are 5 considerations.

16   Q.  I'm asking you in your methodology, how you do your

17        methodology in cases.

18             A score of 3, in terms of your methodology is

19        consistent with 4.4 percent, not 7.4 percent.  Correct?

20   A.  So again, as it relates to my methodology, if you look

21        at Schedule 4a and you count up, I have five above.

22        Therefore, the total score is a 22, which is 7.4

23        percent.

24   Q.  But I'm asking you about a score of 3 right now.

CONFIDENTIAL

Page 73

1   A.   Yes.  Total Score is 22.  If you look back at the

2        Schedule 4b, the Total Score is 22.

3   Q.   On this Exhibit 292, you have a 3 that is consistent

4        with 4.4 percent, a 21 that is consistent with 5.8

5        percent, and a 22 that is consistent with 7.4 percent.

6             Is that reasonable?

7   A.   Well, what appears to have happened if you go back to

8        Schedule 4a, the first page, and add up the score, it is

9        a 22 with 5 considerations with the apportionment rate

10       of 7.4 percent.

11  Q.   But am I right that you have on Exhibit 4b, a 3 that is

12       consistent with 4.4 percent, a 21 that is consistent

13       with 5.8 percent and a 22 that is consistent with 7.4

14       percent?

15            Is that reasonable?

16  A.   That's what it says on the paper.  That's not what my

17       final opinion is.

18  Q.   All right.

19  A.   My final opinion is 7.4 percent with a Total Score of

20       22.

21  Q.   Is the score of 22 a typo?

22  A.   The score of 22 is not a typo.

23  Q.   Is the score of 21 a typo?

24  A.   Yes.  It is.

CONFIDENTIAL

1    Q.  Is the score of 3 a typo?

2    A.  Yes.  It is.

3    Q.  Can you explain to me how the score of 3 was put onto

4        Exhibit 4b, if you know?

5    A.  I don't know.

6    Q.  Can you explain to me how the score of 21 was put on

7        Exhibit 4b, if you know?

8    A.  I do not know.

9    Q.  Can you tell me all of the circumstances that lead to

10       the score of 3 being placed on 4b?

11   A.  I -- it's literally a typo.

12   Q.  Do you know it's a typo that no one on your team

13       consciously put 3 on this 4b?

14   A.  Yes.

15   Q.  Have you talked to anyone on your team about this score

16       of 3 before today?

17   A.  I've talked to the team before today about the total

18       score of 22.

19   Q.  Sir, prior to your deposition today, have you ever

20       noticed that Exhibit 4b has a 3 on it?

21   A.  I did not.

22   Q.  Prior to today, have you ever noticed that Exhibit 4b

23       has 21 on it?

24   A.  Yes.  I did.

CONFIDENTIAL

Page 109

1    BY MR. GROSS:

2    Q.  Mr. Bania, I want you to please turn to Page 9 of your

3       report, and I'll just let everyone know we're going to

4       be loading Exhibit G as the next exhibit, something

5       we've -- Document G, but that will be coming up in a

6       minute.

7           So Mr. Bania, we are looking at Page 9 of your

8       Opening Report, which is Exhibit 286.

9           Will you let me know when you're there, sir?

10   A.  I am on Page 9 of my Opening Report.

11   Q.  And at the top you say Musical Artist Marketing.

12   A.  Yes.

19   Q.  All right.  And the Accused Products are the Samsung

20      Galaxy S10 that we've talked about.  Right, sir?

21   A.  Yes.

22   Q.  So I do want to talk about your understanding and basis

23      for how these artists have promoted the Samsung Galaxy

24      S10.  All right, sir?

CONFIDENTIAL

Page 110

1   A.  Yes.

2   Q.  Okay.  And you do understand at a high level that the

3       Samsung Galaxy S10 was launched in early calendar year

4       2019?

5   A.  That's correct.

6   Q.  Okay.  And before 2019, Samsung had earlier versions of

7       the Samsung Galaxy S.  You're aware of that generally?

8   A.  Yes.

9   Q.  And you're also aware that after the Galaxy S10, there

10      were other versions of the Galaxy S that were released

11      up and to the present date.

12          You're aware of that, correct, sir?

13  A.  That's correct.

14  Q.  But I want to focus on the year 2019 when the Samsung

15      Galaxy S10 line of phones was launched.  All right,

16      Mr. Bania?

17  A.  Yes.

18  Q.  ██████████████████████████████████████

    ██  ██████████████████████████████████████

    ██  ██████████████████████████████████████

    ██      ████████████████████████

    ██  ████████████

23  Q.  Okay.  And what I want to do is call up what you have as

24      your citation at Footnote 52 and we'll make that the

EXHIBIT A
PAGE 16

CONFIDENTIAL

Page 157

1 ████████████████████████████

█ ███████

█ ████████████████████████

█ ███████████

█ ██████████████████████████████

█ █████████████

█ ███████

█ ████████████████████████████████

█ ████

█ ████████

11    Q.    Have you done your matrix analysis focusing on the word

12          Galaxy at any time prior to today that resulted in a

13          specific percentage?

14    A.    The matrix, the Subject IP is S10.  It's not the Galaxy.

15          Galaxy is taken into consideration.  Samsung, a brand.

16          Galaxy, a sub-brand.  S10, a sub-brand.

17              But no, I did not run the matrix for anything but

18          the Subject IP at issue in this case, which was S10.

19    Q.    If you were to run the matrix for the term Galaxy, do

20          you have any idea what the percentage would end up under

21          your matrix?

22    A.    I mean, it's not relevant to this case so I have not run

23          that, no.  If I did, I have no idea what that would turn

24          out to be.

CONFIDENTIAL

Page 177

1          But I think some other parts of my testimony have been

2          excluded but nothing like this.

3               If anybody asks me have I ever been excluded or,

4          you know, a Daubert motion, you know, this is what I

5          bring up.

6     Q.   Okay.  And do you know if that order was ever changed,

7          to your knowledge?

8     A.   I don't think so.  I would hope the attorneys would have

9          told me if it had.

10    Q.   And did you use the 17 considerations in that opinion?

11    A.   No.

12    Q.   Okay.  And sir, let me ask you one question about

13         points.

14    A.   About what?  I'm sorry.

15    Q.   Points.

16    A.   Points.

17    Q.   1 to 5.

18    A.   Uh-huh.

19    Q.   1 to 5 points.

20    A.   Yep.

21    Q.   In prior cases -- I mean litigated cases, have you

22         always used a 1-to-5 range of points?

23    A.   We've always used 1 to 5, yes.

24    Q.   And have you ever seen an article written that discusses

CONFIDENTIAL

Page 185

1    Q.  Same question, 652.

2    A.  That is correct.

3    Q.  All right.  And then same question, 653.

4    A.  That's correct.

5    Q.  Same question, 654.

6    A.  That's correct.

7    Q.  Same question, 655.

8    A.  That's correct.

9    Q.  Same question, 656.

10   A.  That's correct.

11   Q.  And continuing, same question for any remaining pages.

12       Take your time.

13   A.  Yes.

14   Q.  And let's continue.

15   A.  Correct.

16   Q.  Continue.

17   A.  Yes.

18   Q.  Continue.

19   A.  Correct.

20   Q.  Okay.  We can stop sharing.

21   A.  So you know, I think -- I think it's important that I

22       provide the chapter, the draft chapter that has the

23       scoring.

24           Now as I've explained or maybe I have not

CONFIDENTIAL

Page 186

1    explained, you know, this matrix has been published --

2    this will be the third or fourth time, I can't remember,

3    the new one that's coming out next year.  That draft is

4    in and it does talk about the scoring.

5        And the reason why it talks about the scoring is

6    just educating the reader more fully on how the process

7    works.  I do think that that is important, you know, to

8    be presented at trial and it is the framework that I

9    followed as it relates to my analysis in this case.

10        Now could I get that to you in 30 seconds,

11    possibly.

12  Q.  Well --

13  A.  I might need two minutes.

14  Q.  -- let's be clear, there's absolutely no way you can add

15    a draft chapter to your report today so we're going to

16    be having motion practice about this, and the judge will

17    have to decide whether you can add a draft chapter that

18    you mentioned in the afternoon of your expert

19    deposition.

20  A.  Okay.

21  Q.  So to be clear, the 30 seconds has passed and there's no

22    possible way after going over this chapter I'm now going

23    to have you add anything.

24        Now I do want to be clear, whatever you're talking

EXHIBIT A
PAGE 20

CONFIDENTIAL

Page 187

1        about today, is it available on the internet today?

2   A.   The process that I took in this case that includes the

3        point system, is that available on the internet?

4   Q.   No, the draft chapter.

5   A.   Oh, no.

6   Q.   So had we researched on the internet to try to find this

7        draft chapter without talking to you, was it available

8        on the internet for other law firms and the like prior

9        to today, that you're aware of?

10  A.   No.  I think it's still under peer review so it's still

11       in draft form.

12  Q.   Okay.  So whatever we're talking about is a draft

13       chapter that you believe is under -- currently under

14       peer review?

15  A.   The process I followed, yes.

16  Q.   Okay.  And so the 1-to-5 point system that may be in the

17       draft chapter is in a document that you believe is in

18       the middle of peer review?

19  A.   Yes.

20  Q.   Okay.  And are you able to tell us what people are

21       involved in the peer review system?  Do you know the

22       names of them?

23  A.   I do not.  BVR is a team.

24  Q.   Okay.  So then what I'm just going to tell you is

CONFIDENTIAL

Page 190

1       Edition, I don't recall.

2           But your question to me was do I know anybody

3       referencing this in an expert report or using this in an

4       expert report.  And my answer to that is I have received

5       calls from other experts looking for an apportionment

6       matrix and me sending a chapter to them.

7   Q.  Right.

8           But the chapter would be either Exhibit 288 or a

9       prior version, correct?

10  A.  Correct.

11  Q.  Okay.  So sir, have there ever been a prior version of

12      the chapter that's reflected in Exhibit 288 that had the

13      1-to-5 point system that you're aware of?

14  A.  No.

15  Q.  Okay.  So when people have reached out to you about

16      getting versions of your chapters, it's been either

17      Exhibit 288 or a prior version?

18  A.  That's correct.

19  Q.  Okay.  So you said your co-author has used the 1-to-5

20      point system in litigated trademark infringement

21      cases?

22  A.  Yes.

23  Q.  In written opinions?

24  A.  Yes.  Well, what do you by "written"?  What do you mean?